JUDGE CAPRONI

ANDREW M. CALAMARI
REGIONAL DIRECTOR
**Attorney for the Plaintiff**
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336-0589 (Howard A. Fischer, Senior Trial Counsel)
Email: FischerH@SEC.Gov



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

14 CV 1528

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          -against-

STEVEN H. DAVIS, STEPHEN DICARMINE,
JOEL SANDERS, FRANCIS CANELLAS, and
THOMAS MULLIKIN,

                    Defendants.

---

14-CV-  (  )

COMPLAINT

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Steven H. Davis ("Davis"), Stephen DiCarmine ("DiCarmine"), Joel Sanders

("Sanders"), Francis Canellas ("Canellas"), and Thomas Mullikin ("Mullikin"), (collectively, the

"Defendants"), alleges as follows:

<u>SUMMARY OF ALLEGATIONS</u>

1.      This case involves a fraudulent bond offering in April 2010 (the "Bond

Offering"), by Dewey & LeBoeuf LLP ("Dewey"), a now defunct international law firm.[1]

---

[1]      Dewey has filed for Chapter 11 bankruptcy protection. <u>See</u> <u>In re Dewey & LeBoeuf</u>

Investors in the Bond Offering relied on Dewey's fraudulent and materially misstated financial results for 2008 and 2009, which were incorporated into the private placement memorandum ("PPM"), and provided to investors.

2.      Unbeknownst to investors, the Defendants – a collection of Dewey's senior most legal and business professionals – had orchestrated and executed a bold and long-running accounting fraud intended to conceal the firm's precarious financial condition.  Investors believed they were purchasing bonds issued by a prestigious law firm that had weathered the financial crisis and was poised for growth; in reality, the financial results disclosed in the PPM were materially misstated.

3.      The roots of the fraud date back to late 2008, when the Defendants first became aware that Dewey's declining revenue might cause its lenders to cut off access to the firm's credit lines. Dewey and the Defendants thereafter initiated a wide-ranging campaign to manufacture fake revenue by manipulating various entries in Dewey's internal accounting system.

4.      In connection with closing out its 2008 financial results, Dewey inflated its profitability – defined as the excess of fees collected over operating and non-operating expenses – by approximately $36 million, or 15%, using several inappropriate accounting entries. Among other gimmicks, the Defendants reclassified salaried partners' and of counsels' compensation as equity distributions in the amount of $13.8 million, improperly reversed millions of dollars of uncollectible disbursements, mischaracterized millions of dollars of credit card debt owed by the firm as bogus disbursements owed by clients, and improperly accounted for significant lease obligations held by the firm.

LLP., No 12-12321 (MG)(Bankr. S.D.N.Y. May 28, 2012).

2

5.    Dewey continued using these and other fraudulent techniques in preparing its 2009 financial statements, which were misstated by $23 million. Dewey and Defendants undertook a wide-ranging campaign of fraud and deception.  So pervasive was the culture of financial chicanery at Dewey's top levels that its highest ranking officials – including the Defendants – had no qualms about referring among themselves in various emails to "fake income," "accounting tricks," "cooking the books," and deceiving what they described as a "clueless auditor."

6.    Dewey's accounting fraud was orchestrated by the firm's senior-most finance professionals, most notably Joel Sanders (CFO), Frank Canellas (Director of Finance), and Thomas Mullikin (Controller). Dewey's senior management, which included Steven Davis, the firm's Chairman, and Stephen DiCarmine, the firm's Executive Director, was also aware of and supported these efforts to falsify Dewey's financial results. And it was Davis, in his capacity of Chairman of the firm, who authorized the firm to raise $150 million via a bond offering whose PPM incorporated blatantly falsified financial results.

7.    Dewey continued using and concealing improper accounting practices well after the Bond Offering closed in April 2010. The Note Purchase Agreement ("NPA"), governing the Bond Offering, required Dewey to provide its investors and lenders with quarterly certifications that Dewey was not in breach of its debt covenants and to provide certain related financial information. The quarterly certifications that Dewey made pursuant to the NPA were all fraudulent.

## VIOLATIONS AND RELIEF SOUGHT

8.    By virtue of the conduct alleged herein:

3

a.      Davis, directly or indirectly, singly or in concert, has engaged in acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

b.      DiCarmine, Sanders, Canellas, and Mullikin, directly or indirectly, singly or in concert, have engaged in acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and aiding and abetting Dewey's and Davis's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a final judgment: (i) restraining and permanently enjoining Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein; (ii) requiring Davis, DiCarmine, Sanders, Canellas, and Mullikin to each disgorge the ill-gotten gains they received, if any, as a result of their violations, and to pay prejudgment interest thereon; (iii) imposing civil monetary penalties upon Davis, DiCarmine, Sanders, Canellas, and Mullikin pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and/or Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and (iv) pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] barring defendants Davis, DiCarmine, and Sanders from

4

serving as an officer or director of any public company. Finally, the Commission seeks any other relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this action under Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

11. Venue is proper in the Southern District of New York under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York (for instance, the Defendants solicited investors for the Bond Offering in this District and operated from Dewey's headquarters located in this District) and were effected, directly or indirectly, by making use of the means and instruments of transportation or communication in interstate commerce, or the mails.

## DEFENDANTS

12. **Steven H. Davis**, age 60, a resident of New York, New York, is an attorney licensed in New York. Davis practiced energy law prior to becoming the chairman of LeBoeuf Lamb Green & MacRae, LLP ("LeBoeuf Lamb") several years before the merger, in October 2007, between Dewey Ballantine, LLP ("Dewey Ballantine") and LeBoeuf Lamb (the "merger"). Davis continued as chairman of the merged firm until around March 2012, when he was removed from his position as sole chairman and replaced with a five member "Office of the Chairman," consisting of himself and four other Dewey partners. In or around April 2012, Davis was removed altogether from his leadership position at Dewey.

13.     **Stephen DiCarmine**, age 57, a resident of New York, New York, is an attorney licensed in New York and was the executive director of LeBoeuf Lamb since 1998, and continued in that position after the merger.

14.     **Joel Sanders**, age 55, is a resident of Miami, Florida. Sanders served as the chief financial officer of Dewey since the merger.

15.     **Frank Canellas**, age 34, is a resident of Long Island, New York. Canellas joined LeBoeuf Lamb as a junior accountant in 2001. After the merger, he became finance director at Dewey and reported to Sanders.

16.     **Thomas Mullikin**, age 43, is a resident of Bergen County, New Jersey. Mullikin held various positions in Dewey Ballantine's accounting group where he worked since around 1993. After the merger, Mullikin was the controller of Dewey until June 2011, when he left to become controller at another law firm.

**FACTS**

**I.    DEWEY MISSTATED ITS FINANCIAL RESULTS AND CONDITION TO CONCEAL BREACHES OF DEBT COVENANTS IN ITS LOAN AGREEMENTS**

17.     Dewey was the product of a merger in October 2007 between Dewey Ballantine and LeBoeuf Lamb. Following the merger, Dewey experienced severe financial difficulties as a result of the steep costs arising from the merger and exacerbated by the economic recession.

18.     In or around July 2008, Dewey entered into an *omnibus* credit agreement with four banks with which it had lines of credit. This *omnibus* credit agreement contained a financial covenant, which required Dewey to maintain an annual cash flow, defined as Net Income plus Depreciation, of $290 million (the "Cash Flow Covenant").

19.     As the end of 2008 approached, Dewey's finance group—principally in the form of CFO Sanders and Finance Director Canellas—informed Davis and DiCarmine that the firm was in serious jeopardy of breaching the Cash Flow Covenant because the firm's revenue had dried up.

20.     For the year ended December 31, 2008, the firm missed its budgeted revenue by almost $200 million and its budgeted profitability by over $150 million. The Defendants were aware that a breach of the Cash Flow Covenant could cause Dewey's lenders to pull their lines of credit, imperiling the firm's ability to operate.  In short, Dewey faced an existential crisis. Rather than admit to this publicly, or to seek to renegotiate its credit arrangements, Dewey instead embarked on the course of fraudulent conduct described herein.

21.     On December 4, 2008 Sanders emailed Canellas: *"What revenue number must we hit not to breach our covenants?"* Canellas responded:  *"The covenant is on Cash Flow, described as net income plus depreciation. The agreement call [sic] for Cash Flow of 290M. Budgeted expenses are 715 less 11M of depreciation. Hence, we will need 994M in Revenue to be in compliance."*

22.     On December 23, 2008, in response to a report that clients were trying to delay their payments to Dewey to avoid breaching their own bank covenants, Sanders told Davis: *"That's precisely what I'm concerned about. The banks will pull our lines in a heartbeat if we don't satisfy our covenants."* Davis responded:  *"That's what I [sic] told him [another Dewey partner]."*

23.     By December 30, 2008, Dewey was on the cusp of a massive shortfall, with only one business day remaining in which to collect enough revenue to meet its Cash Flow Covenant.

Late on December 30, 2008, Sanders emailed DiCarmine and Davis to inform them the firm needed "*$50M [in collections] tomorrow to meet our covenant.*" Davis responded: "*Ugh.*"

### Canellas and Sanders Devise a "Master Plan"

24.     Canellas and Sanders, working closely with a young collections manager ("Collection Manager A"), who was promised to receive his full target bonus if Dewey met its Cash Flow Covenant, hatched a scheme at the very end of 2008 to falsify numerous entries in Dewey's books and records in order to increase the firm's net profit.

25.     Canellas outlined this strategy in a detailed spreadsheet entitled "Master Plan," which listed Dewey's actual net profit, the amount it needed to meet its Cash Flow Covenant and itemized adjustments, most of them improper, which would allow the firm to appear in compliance with the Covenant.

26.     Canellas then instructed his and Sanders's staff, including Mullikin, to carry out these fraudulent adjustments, and to devise other improper adjustments to artificially boost Dewey's net profits.

27.     At the end of the business day on December 31, 2008, Collections Manager A sent a congratulatory email to Canellas with the subject line: "*Great job dude. We kicked ass! Time to get paid.*"

28.     In the body of the email, Collections Manager A applauded Canellas for his creativity and reminded him of their richly due reward: "*Hey man, I don't know where you come up with some of this stuff, but you saved the day. It's been a rough year but it's been damn good. Nice work dude. Let's get paid!*"[2]

---

[2]     Collections Manager A left Dewey in or around June 2009.

29.     The collections effort, however, still fell short of Dewey's goal to meet its Cash Flow Covenant. On January 5, 2009, a distressed Canellas emailed Mullikin: *"We are short on the covenant. I really need your help with some ideas. We need to hit it. Start thinking and let's talk sometime this morning."*

30.     The fraudulent adjustments made by Sanders, Canellas and their staff including Mullikin, took various forms, as summarized below.

### 1. Reclassifying Salaried Partners' and Of-Counsels' Compensation as Equity Distributions

31.     In or around early 2009, Canellas improperly moved compensation paid to two salaried partners from an expense account on Dewey's 2008 general ledger to an equity distribution account. Canellas also instructed a Dewey partner relations specialist to move the compensation of three of-counsel attorneys from an expense account to an equity distribution account. The distribution account was a balance sheet account, and these adjustments resulted in Dewey lowering its salary expenses and increasing its net profit by $14.3 million.

32.     At the time these improper adjustments were made to Dewey's books, these salaried partners and of-counsel had no equity in the firm and they were not told of the changes. The compensation-related modifications were a sham designed to create the illusion of higher profitability. Davis and DiCarmine were informed of these adjustments and knew or recklessly disregarded that they were improper.

### 2. The Reversal of Uncollectible Disbursements

33.     Dewey recorded its income under the income tax basis of accounting, which requires fees to be recognized when received from its clients, not when billed. Accordingly, Dewey did not report those receivables on its financial statements.

34.     Disbursements were costs—such as travel, word processing, or legal research—incurred by Dewey on behalf of a client, which Dewey would later bill its client. Dewey's clients would then reimburse these amounts when paying their bills for legal services.

35.     These costs were initially recorded as receivables on Dewey's books and records when paid by Dewey, and included within the financial statement line item entitled "Accounts receivable-client disbursements."

36.     Dewey had a collections group within the firm, which assessed the collectability of aged disbursements and fees. The collections group referred any receivables it believed to be uncollectible to Dewey's collections committee—which consisted of certain Dewey partners—who would conduct further inquiry and review to ultimately determine whether to approve any write-offs. When disbursements were written off, the amounts were moved from a balance sheet receivable to an expense item, which correspondingly reduced Dewey's net profit.

37.     In or around early 2009, Canellas instructed Dewey's director of revenue support, to reverse write-offs for disbursements, which had previously been deemed uncollectible and totaled $3.8 million.

38.     Fraudulently reversing these write-offs had the desired result; they increased Dewey's net profit by $3.8 million.

### 3. "Joel's Amex"

39.     Sanders, and others at Dewey, incurred $2.5 million of American Express credit card expenses before the merger. While this was originally recorded as an asset earlier in 2008, Dewey wrote off this asset in or around November 2008.

40.     In or around early January 2009, Canellas directed Mullikin, Dewey's controller, and Employee B, an accounting manager, to reverse this write-off and reclassify the expenses as "unbilled disbursements" (*i.e.*, an asset related to unbilled client expenses).

41.     On January 7, 2009, Mullikin emailed Canellas: *"They didn't do the entry [reverse the write-off] for Joel's amex. Do you want them to put that entry in?"* Canellas responded: *"Maybe we should do it to a pending billable matter."* Mullikin then responded: *"That would be less visible."*

42.     Dewey mischaracterized the Amex debt as an unbilled disbursement again in 2010 and 2011.  By early 2011, however, Mullikin and Canellas were increasingly concerned that the crude nature of the gimmick would attract scrutiny.  For example, on January 11, 2011, Mullikin wrote to Canellas: *"Before we close I think we should writeoff [sic] at least 1.2 million of the amex charges from Joel's amex that have been sitting with us in [account] 1211 for so long. I don't see how we'll get past the auditors another year. We should be able to reverse some smaller write-offs to offset it."*

### 4.  Double Booking Income from Partner A and his Client

43.     In or around the end of 2007, a client of Partner A, a salaried partner who worked in Dewey's Riyadh, Saudi Arabia office, owed Dewey approximately $1.4 million for work performed by Partner A.  The client informed Partner A that it would not make the payment by the end of 2007.

44.     In order to ensure that the client's fees counted toward his targets for the year, Partner A, with Davis's approval, loaned $1.4 million to Dewey at the end of the year, which Dewey agreed to pay back when the client paid its bill.  Dewey improperly booked the partner's

11

payment as income and did not record its status as a loan, which Davis knew or recklessly disregarded.

45.     In or around August 2008, the client paid Dewey approximately $8 million, which included the $1.4 million owed from the previous year. Dewey also booked that $1.4 million as income.[3]

46.     For over two years Dewey refused to pay Partner A the amounts it owed to him. In early 2010, after extensive discussions involving Davis, DiCarmine and Sanders, Dewey finally agreed to pay back Partner A the $1.4 million after the Bond Offering was completed.

47.     During the course of these discussions with Partner A, Sanders characterized the $1.4 million loan in emails to Partner A as an "audit problem," and DiCarmine acknowledged that it "had been booked as income to the firm. . . ." Both these emails were forwarded to Davis.

### 5.  Improperly Accounting for Costs of Redundant Office Space

48.     In or around early 2008, following the merger, Dewey vacated one of its London offices before the lease term expired, and was therefore required to pay an early termination or break-up fee of approximately $3.3 million to assume its remaining obligations under the lease. Dewey thereafter had no involvement with or obligations under the lease for its London offices.

49.     In or around February 2008, Canellas inquired with the firm's auditor (the "Auditor") as to the proper accounting treatment of the break-up fee and fixed assets related to Dewey's London office lease. The Auditor advised Canellas that Dewey could amortize the fee

---

[3]     The $1.4 million and other amounts received as part of the $8 million payment were originally booked to a disbursement account, which did not affect the P&L. Effective December 31, 2008, Dewey reclassed approximately $1.5 million from the disbursement account (which included the $1.4 million loan amount) as a fee, which increased Dewey's income.

and fixed assets over the term of the lease only if certain conditions were met, among which included, that Dewey remained as a guarantor on the lease.

50.     In or around July 2008, Dewey's Director of International Finance, located in London, confirmed to Canellas that Dewey was not, in fact, a guarantor on the lease, and thus could not amortize the payment for the break-up fee or fixed assets associated with the leased office space.  In or around January 2009, Mullikin and Canellas decided that the $3.3 million break-up fee, which had previously been recorded on Dewey's books as an expense in 2008, should now be reversed so it could be amortized over the life of the lease period, which extended through 2019.

51.     Mullikin and Canellas also improperly amortized $5.2 million of fixed assets through the life of the lease instead of properly expensing that amount.  A Dewey employee falsely represented to a junior auditor that the break-up fee premium was in fact a consulting fee purportedly related to the new tenant's assumption of the lease, and thus should be amortized over the life of the lease.

**B.     Davis and DiCarmine Were Aware of and Supported the Year End 2008 Efforts to Inflate Dewey's Financial Statements to Meet its Cash Flow Covenants.**

52.     While Defendants Sanders, Canellas and Mullikin were the day-to-day architects of Dewey's accounting fraud, they had the support and approval of Defendants Davis and DiCarmine, and made little effort to hide the details of the fraud from them.

53.     In a December 4, 2008 email exchange entitled "IT Spend," Sanders vented to Dewey's Chief Operating Officer, copying DiCarmine on the email, about the firm's cash flow problems and his concern that someone at Dewey had approved the execution of costly

information technology improvements at the firm without his knowledge or approval.  In the course of expressing his anxieties over Dewey being "hit with a few million [  ] worth of bills in January," Sanders told the COO, *"I don't know anything about [the contracts] and I don't want to cook the books anymore. We need to stop doing that."* (emphasis added).

54.     Contrary to his professed anxieties about "cooking the books" and the "need to stop doing that," on December 29, 2008, while in the midst of the mad scramble to meet the covenants, Sanders boasted to DiCarmine in an email:  *"We came up with a big one: Reclass the disbursements."*

55.     To which DiCarmine responded: *"You always do in the last hours. That's why we get the extra 10 or 20% bonus. Tell [Sander's wife], stick with me! We'll buy a ski house next. Just need to keep the ship a float [sic] and take care of the top and bottom, the middle can move."*

56.     Late on December 31, 2008, DiCarmine emailed Sanders: *"You certainly cheered the Chairman [Defendant Davis] up. I could use a dose."*

57.     Sanders responded:  *"I think we made the covenants and I'm shooting for 60%."* Sanders cryptically added: *"Don't even ask – you don't want to know."*

58.     On January 8, 2009, Sanders emailed Davis and DiCarmine summary financials showing how Dewey would meet the bank covenants for 2008 and estimating the amount of money it could distribute to partners. The summary financials pointedly contained line items enumerating certain improper adjustments included in the "Master Plan."  For example, "Adjusted Bank Income (including equitization of Of Counsels)" and "Back-Out Disbursement W/0 [Write-Off]."

59.     As a result of these and other improper adjustments, Dewey met the Cash Flow Covenant by approximately $3 million. Dewey misstated its net profit by at least $36 million in 2008; approximately $31 million of that amount was used to help the firm meet its Cash Flow Covenant.

60.     Sanders, Canellas and Mullikin expressed occasional concern that the Auditor would detect their fraudulent accounting practices, but they took a certain degree of comfort in what they viewed to be the ineptitude of the auditors.

61.     By spring 2009, the Auditor fired—for reasons unrelated to the audit work—the partner responsible for the Dewey audit.  On June 27, 2009, the former Auditor partner emailed Sanders his new work contact information.  Sanders forwarded the former Auditor partner's new contact information to Canellas and added:  *"I assume you [k]new this but just in case. Can you find another clueless auditor for next year?"* Canellas responded:  *"That's the plan. Worked perfect this year."*

C.     **Dewey's Financial Struggles Persisted in 2009**

62.     Dewey's financial situation deteriorated further in 2009.  Dewey had to grapple not only with reduced revenues, but also with the consequences of the fraudulent adjustments it made, some of which now would require being written off and thus affect its budget in the current year.

63.     In March 2009, Dewey's budget director emailed Sanders and Canellas PowerPoint slides on Dewey's 2009 projected budget for Sanders to present to Dewey's Executive Committee.  The budget director wrote:  *"Here [sic] the revised presentation. I think this is how you want it. I have marked the slides you want to show to Steve only but not in your presentation."*

64.     One of the pages marked "*Steve's copy*" includes a list of accounting entries made for 2008, that included many of Dewey's fraudulent entries broken down into two categories, "Adjustments (do not impact 09 budget)," including "Equitization of Of Counsel" and "Adjustments (impact 09 budget)" including "Capitalize London Wall reverse premium" and "Reduction in disbursement write-offs." The PowerPoint presentation was then forwarded to DiCarmine.

65.     By mid-2009, a culture of accounting fraud had taken root at Dewey under the Defendants' watch.  For example, in an email dated May 28, 2009, bearing the subject line "*Confidential – For your eyes only*," Canellas sent Sanders a schedule containing a list of suggested cost savings to Dewey's budget, among which included, a $7,500,000 reduction entitled "*Accounting Tricks*."

66.     For the year ended December 31, 2009, Dewey missed its budgeted revenue by almost $100 million, or 11%, and its budgeted profitability by over $60 million, or 20%.

67.     In late 2009, it became clear that covenant breaches would again be a problem for Dewey, as would efforts to compensate Dewey's partnership.

68.     On November 10, 2009, Sanders emailed Davis, DiCarmine, Dewey's chief operating officer, and Canellas with an update on the firm's efforts to collect revenue in the final months of 2009.

> I said at the Exec Committee meeting that if we can *really collect (with no adjustments)* between $850 and $875 then we will do between $14k and $15k per point. (emphasis added).[4]

---

[4]     Each partner at Dewey was assigned points to determine their compensation. Each point was ascribed a dollar value based on the firm's income in a given year.

If we bring $850M in the door *(real collections – no accounting adjustments including constructive receipt or reclassing disbursements)* we can get really aggressive and push the envelope to $14k per point. If we really bring in $875M then we can push to get to $15k per point. *Keep in mind though that at these levels we will not have the cash to pay the partners by Jan 31 since $25M is fake income* (emphasis added).

69.     On December 9, 2009, Sanders emailed Davis and DiCarmine:

I'm really sorry to be the bearer of bad news but I had a collections meeting today and we can't make our target. *The reality is we will·miss our net income covenant by $100M and come in at about $7k per point.* At this point I can't tell whether the inventory just isn't really there or our partners just can't convert it but either way I just cannot make it happen. I can probably come through with enough *"adjustments"* to get us to miss the covenant by $50M-$60M and get the points to $10k but that pretty much wipes out any possible cushion we may have had for next year which was slim at best (emphasis added).

70.     That same day, DiCarmine emailed Sanders:  *"should we bring Frank [Canellas] to lunch today?  he might need some reassuring."* Sanders responded:  *"I don't know. He's starting to wig a little. Maybe he's hearing and seeing too much . . . ."*

71.     Shortly thereafter, at the same time that they were leading the firm's increasingly corrupt financial and accounting efforts, Davis approved DiCarmine's, Sanders's and Canellas's receipt of personal lines of credit from Dewey's bank, backed by updated employment agreements that guaranteed their compensation even if Dewey should "enter into dissolution."

72.     Unable to book enough fraudulent entries to meet its covenants, in late 2009, Dewey was forced to share some limited information with its banks about its financial woes, and persuaded its lenders to relax the Cash Flow Covenant for 2009 to net cash flows of $246 million.  Dewey, however, still made numerous inappropriate accounting adjustments to satisfy even this reduced amount.  Dewey ultimately made approximately $23 million in adjustments and met the cash flow covenant by approximately $7 million.

D.     **The Defendants' Other Fraudulent Conduct**

73.     Dewey's senior management, including Davis, DiCarmine, and Sanders, was also involved in efforts to backdate client checks to attempt to falsely record revenue.

74.     Dewey's financial statements were prepared using the income tax basis of accounting, under which revenue must be recorded when received, regardless of when billed or checks mailed.

75.     For years-end 2008 and 2009, Davis, as chairman of the firm, directly encouraged his fellow partners who had clients with outstanding bills to request Dewey's clients to backdate checks so that the amounts could be used to bolster the firm's prior year's income.

76.     DiCarmine and Sanders knew of and approved these efforts to backdate checks at Dewey.

77.     For year-end 2009, at least one check was backdated to December 2008.

78.     In early 2010, in the months leading up to and during the Bond Offering, Dewey continued to misstate its financials.

79.     For example, in November 2009, Dewey learned that it would no longer be performing work for a major corporate client that paid a $5 million dollar retainer.  The client requested that Dewey return $4.6 million of the $5 million retainer, which Dewey, at Sanders' direction, delayed until January 2010 so as to not reduce Dewey's income by $4.6 million for the year.  Instead of writing off the $4.6 million when it was returned, Sanders instructed the director of revenue support to dribble it out by writing off the amount over five months, through May 2010.  This would have caused Dewey to overstate its income in its quarterly certifications to its lenders.

18

## II.   DEWEY'S $150 MILLION PRIVATE BOND OFFERING

80.   By the end of 2009, Dewey owed its lenders approximately $206 million, with $118 million due by the end of 2010. The firm also needed $240 million to pay its partners, but had only $119 million in cash as of December 31, 2009.

81.   To alleviate the burden of its crushing debt, in or around January 2010, Dewey sought to raise $125 million in a senior secured notes offering. Investment Bank served as the sole placement agent on the deal. Investment Bank's agreement with Dewey provided, in relevant part, that its role was to find potential buyers for the debt and that it was relying solely on the information provided by Dewey.

82.   Canellas signed the engagement letter with Investment Bank on behalf of Dewey.

83.   Each of the Defendants was fully aware that the financial backbone of the Bond Offering—Dewey's audited 2008 financial results and unaudited 2009 results—was contaminated by the fraudulent accounting practices described herein.

84.   In or around January 2010, Davis and DiCarmine approved proceeding with the Bond Offering to be accompanied by a new line of credit.

85.   In or around February and March 2010, Dewey's financial staff, including Sanders, Canellas, and Mullikin, compiled financial and other relevant information to include in the PPM that was provided to investors.

86.   Dewey also provided Investment Bank with its 2008 audited financial statements and its 2009 compliance certifications, containing its unaudited financial statements.

87.   On or about March 1, 2010, Davis approved the form of the PPM, and Sanders sent the PPM to Investment Bank for onward transmission to investors.

88.     Defendants solicited investors directly through conference calls, PowerPoint presentations, and meetings.  During this time, potential investors submitted questions to Investment Bank based on the information contained in the PPM and Dewey's audited financials.

89.     Dewey's financial staff, including, Sanders, Canellas and Mullikin each worked on providing answers to investor questions, which were submitted to Investment Bank.

90.     On or about March 8, 2010, Dewey conducted a lengthy conference call with potential investors.  Canellas, Sanders and DiCarmine attended the conference call.  An investor PowerPoint presentation containing much of the same information as contained in the PPM, including financial statement summaries, was provided to investors for the call.  DiCarmine, Sanders and Canellas each reviewed the PowerPoint presentation in advance of the conference call.

91.     On March 18, 2010, in an email to a corporate partner who served as Dewey's counsel for the Bond Offering, and was a member of Dewey's executive committee ("Partner C"), Davis increased the amount of the Bond Offering from $125 million to $150 million:  *"After you left the office, Joel [Sanders] called and I made an "executive" decision regarding the amount of the PP[Private Placement]. I told him to go for the full $150 mm and to cut back our use of the revolvers."*

92.     On or about April 12, 2010, Davis, as chairman of the firm and of the executive committee, led Dewey's Executive Committee meeting to authorize issuing the notes and executing the NPA.  Sanders and DiCarmine also attended this meeting, at which Dewey's Executive Committee approved the Bond Offering based on the terms contained in the NPA.

93.     Davis, DiCarmine, Sanders and Partner C were given signature authority on the NPA by the executive committee. On or about April 16, 2010, Dewey and the investors executed the NPA memorializing the Bond Offering. Partner C signed the NPA on behalf of Dewey.

94.     The Bond Offering was oversubscribed and Dewey raised $150 million from thirteen (13) insurance companies by issuing several tranches of debt with maturities ranging from three to ten years. Interest on the notes purchased in the Bond Offering was due semi-annually and the principal for the first tranche of debt was not due until 2013.

**A.     Material Misrepresentations and Omissions to Investors in the Bond Offering**

95.     As alleged above, Dewey's 2008 and 2009 financial statements which were provided to investors as part of the PPM, NPA, and at the March 8 conference call were significantly and materially misstated.

96.     For example, in addition to containing inflated balance sheets and income statements, the PPM provided that Dewey's 2008 "Cash Flow"—using the banks' definition for the Cash Flow Covenant—was $293 million, when, in fact, that figure was misstated by over $30 million as a result of Dewey's fraudulent conduct.

97.     As discussed in detail below, Dewey made additional material misrepresentations and omissions in the PPM, NPA, in responses to questions raised by investors sent via Investment Bank, and during a March 8, 2010 investor presentation (the "Investor Presentation"). These material misrepresentations and omissions related to, among other things, Dewey's debt, pension obligations, and partner compensation guarantees.

98.     These items were material to investors because Dewey had no hard assets to be used as collateral or that Dewey could liquidate, and the investors' ability to recover their investment was largely dependent on Dewey's partners and their ability to generate revenue.

99.     Furthermore, any costs unrelated to, or in excess of, income could be particularly damaging to Dewey's stated ability to pay the interest and principal on the bonds.

### 1. Misrepresentations and Omissions in the PPM

#### a.      Dewey Failed to Accurately Disclose its Debt.

100.    The PPM provided a schedule of Dewey's purported existing debt, but, as discussed above, the schedule did not disclose the $1.4 million that Dewey owed to Partner A for advancing his personal funds in lieu of the money owed by his client.

101.    Undisclosed debt was material to investors because Dewey used the proceeds of the Bond Offering to pay off its current debt and was not allowed to incur additional debt.

#### b.      The PPM Misstated Dewey's Practice of Write-offs and Recording Disbursements.

102.    Dewey represented to investors in the PPM that "[t]he billing value for firm services on client matters is recorded as client disbursements and reflected as a reduction of the company's expenses when charged to clients. … Client disbursement receivables are written-off when deemed uncollectible."

103.    To the contrary, as discussed above, Dewey failed to disclose that it did not follow this and other policies. To meet its Cash Flow Covenants, the firm added back onto its books disbursements that it had previously written off.  In its description of its billing and disbursements, Dewey also failed to disclose that Dewey reclassified certain disbursements as fees to meet its Cash Flow Covenant.

### c.   Misstatements Concerning Payments to Former Partners

104.   Potential investors in the Bond Offering expressed concern about Dewey's

unfunded pension payments to former partners.  Yet, as discussed below, Dewey failed to

disclose significant issues relating thereto.

105.   By early 2010, Dewey had ceased making some of its pension payments to former

Dewey Ballantine partners because it did not have sufficient cash to pay these former partners

and meet its other commitments.  This was not disclosed to investors.

106.   Moreover, some of these former partners threatened litigation against Dewey to

enforce the amounts owed to them under the partnership agreement.  This too was not disclosed

to investors. Instead, investors were told that there were no threatened lawsuits against Dewey.

### d.  Guaranteed Contracts and Other Partners' Compensation

107.   Dewey had numerous guaranteed contracts with select partners, the scope of

which was not fully disclosed to investors.

108.   For year-end 2009, Dewey had entered into at least sixteen (16) guaranteed

contracts with certain partners that provided for guaranteed compensation plus additional

amounts to be put into trusts—if the partner remained at Dewey for the duration of the

contract—requiring minimum annual base and bonus payments of over $33 million. The PPM

did not disclose to investors the existence of these compensation guarantees.

109.   Dewey told investors in the PPM that its "partners are paid distribution payments

of earnings in excess of draws in periodic installments, in amounts deemed prudent in

relationship to the firm's overall cash flow needs to bring them to their share of earnings for the

year." This statement was materially misleading. Dewey did not disclose that select partners had

guaranteed compensation agreements under which they were paid regardless of Dewey's overall cash flow needs or net income.

110.     Moreover, Dewey's audited financial statements contain a note disclosing approximately $7 million in cash payments to two Dewey partners as part of long-term employment agreements entered into in 2007, but similarly failed to disclose the existence of the approximately $26 million in guaranteed compensation agreements with numerous other partners at the firm and their adverse effect on Dewey's net profits.

### 2. Misrepresentations and Omissions during the Investor Presentation and in Response to Additional Questions by Investors

111.     On March 8, 2010, Dewey conducted a conference call with potential investors, which DiCarmine, Sanders, and Canellas attended.  This Investor Presentation included a PowerPoint and related printed materials, which were provided to potential investors and contained much of the same information as the PPM, including fraudulent financial statement summaries.

112.     After the conference call, potential investors submitted follow-up questions to Investment Bank to forward to Dewey. Many of these questions pertained to the very issues that Dewey had lied about or concealed up to this point.  For example, investors asked questions about unfunded pension obligations, potential litigation, write-offs and collectability of receivables, and partners' compensation.

113.     Yet, in its responses, Dewey again failed to come clean and disclose that: (a) it had stopped paying its pension obligations and former partners had threatened to file lawsuits against Dewey; (b) it did not follow its collections policies and reversed write-offs to meet its

covenants; and (c) the lock-ups with key partners contained guarantees that were independent of the firm's income or cash flows.

114. Sanders, Canellas, and Mullikin each worked on compiling answers to these questions.

### 3. Misrepresentations and Omissions in the NPA

115. The NPA, which governed the terms of investment in the Bond Offering, also contained material misrepresentations and omissions.

116. The NPA contained a schedule of Dewey's existing debt, which disclosed interest rate swaps as low as $27,471 but failed to mention the $1.4 million owed to Partner A.

117. Section 5.3 of the NPA disclosed to investors that the NPA, PPM, and Dewey's financial statements, among other offering documents, "taken as a whole do not contain any untrue statements of material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made." As discussed above, Dewey's financial statements and offering documents contained false and materially misleading information.

118. Section 5.5 of the NPA provides, in relevant part, that "[a]ll of said financial statements (including in each case the related schedules and notes) fairly present in all material respects the financial position of the Company and the Related Entities . . . and the results of their operations and cash flows." As discussed above this was false and materially misleading.

119. Section 5.8 of the NPA provides, in relevant part, that "[t]here are no actions, suits, investigations or proceedings pending or, to the knowledge of the Company, threatened against or affecting the Company or any Related Entity or any property of the Company or

Related Entity. . ." As discussed above, this was false and materially misleading because several former Dewey Ballantine partners had, in fact, threatened to initiate litigation against Dewey because the firm was delinquent in its pension payments, which were owed to them under the Dewey Ballantine partnership agreement.

120.    Section 9.6 of the NPA provides, in relevant part, that "[t]he company will, and will cause each Related Entity to, maintain proper books of record and account necessary to prepare financial statements on a tax basis." This representation was materially false and misleading because Dewey did not intend to maintain proper books and records during the Bond Offering, which was evident from the fact that during the Bond Offering, Dewey was improperly writing off over a five month period $4.6 million in retainer fees it had returned to a major corporate client.

121.    Section 10.6 of the NPA provided, in substance, that Dewey will not incur, assume or suffer to exist any debt, other than certain enumerated exceptions. This representation was rendered false and materially misleading because Dewey did not disclose the $1.4 million loan that it currently owed to Partner A.

III.    **DEWEY'S COLLAPSE**

122.    Despite obtaining financing through the Bond Offering, Dewey's financial situation continued to deteriorate in 2010 and 2011.

123.    As alleged herein, Dewey continued to misstate its financials and thus provided its investors with false quarterly certifications.

124.    By the end of 2011, the firm's equity had plummeted from $173 million at the end of 2007 to $63 million.

125.    On May 28, 2012, Dewey voluntarily filed for protection under Chapter 11 of the

Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Davis, DiCarmine, Sanders, Canellas, and Mullikin)

126.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 125.

127.    Each of Davis, DiCarmine, Sanders, Canellas, and Mullikin, directly or indirectly,

singly or in concert in the offer or sale of securities, by use of the means or instruments of

transportation or communication in interstate commerce, or by the use of the mails, with scienter

have:

(a)    employed devices, schemes or artifices to defraud;

(b)    obtained money or property by means of untrue statements of material fact or by

omitting to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or

(c)    engaged in acts, transactions, practices and courses of business, which operated or

would have operated as a fraud or deceit upon purchasers of securities.

128.    These acts were material because, among other things, the misrepresented or

omitted facts were important to investors in the Bond Offering.

129.    By reason of the foregoing, Davis, DiCarmine, Sanders, Canellas, and Mullikin

directly or indirectly, violated, and unless enjoined will again violate, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Davis)**

130.    The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 129.

131.    Davis, in connection with the purchase or sale of securities, directly or indirectly,

singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the

mails, or of the facilities of a national securities exchange, with scienter, has:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts

necessary in order to make the statements made, not misleading; or

(c)     engaged in acts, transactions, practices and courses of business, which operated as

a fraud or deceit upon any person.

132.    The misstatements and omissions of fact detailed above were material.

133.    By reason of the foregoing, Davis, directly or indirectly, violated, and unless

enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Davis's and Dewey's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (DiCarmine, Sanders, Canellas, and Mullikin)

134. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 133.

135. As set forth above, both Davis and Dewey committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, through, among other acts, the provision of false and misleading financial statements contained in the PPM, NPA, Investor Presentation, and otherwise in connection with misrepresentations and omissions made in connection with the acts described above.

136. DiCarmine, Sanders, Canellas, and Mullikin knowingly provided substantial assistance to Dewey and Davis in the commission of these violations.

137. Thus, by reason of the activities described, DiCarmine, Sanders, Canellas, and Mullikin, by use of the means or instrumentalities of interstate commerce, or of the mails, with scienter, aided and abetted Dewey's and Davis's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently restraining and enjoining:

(a) defendants Davis, DiCarmine, Sanders, Canellas, and Mullikin, and their agents,

servants, employees and attorneys, and all persons in active concert or participation

with them who receive actual notice of the injunction by personal service or

otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

(b) defendants Davis, DiCarmine, Sanders, Canellas, and Mullikin, and their agents,

servants, employees and attorneys, and all persons in active concert or participation

with them who receive actual notice of the injunction by personal service or

otherwise, from violating Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and

(c) pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] bar

defendants Davis, DiCarmine, and Sanders from serving as an officer or director of

any public company.

## II.

Ordering Davis, DiCarmine, Sanders, Canellas, and Mullikin to disgorge any and all ill-gotten gains they received as a result of their violations of the federal securities laws, plus prejudgment interest thereon;

## III.

Ordering Davis, DiCarmine, Sanders, Canellas, and Mullikin to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws; and

## IV.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       March 6, 2014

By: _____

Andrew M. Calamari
SECURITIES AND EXCHANGE COMMISSION
Regional Director
Howard A. Fischer, Senior Trial Counsel
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@SEC.gov

Of Counsel:
Sanjay Wadhwa (WadhwaS@sec.gov)
Michael J. Osnato (OsnatoM@sec.gov)
William Finkel (FinkelW@sec.gov)
Joseph P. Ceglio (CeglioJ@sec.gov)

# APPENDIX A

## Defendants' Compensation

|  | 2009 | 2010 | 2011 |
|---|---|---|---|
| Canellas | $435,000 (including $100,000 bonus) | $445,000 (including $210,000 bonus) | $616,000 (including $265,000 bonus) |
| Davis | $370,000 | $3,000,000 | $1,320,000 |
| DiCarmine | $2.5 mil. (including $1.5 mil. bonus) | $2.1 mil. (including $1.1 mil. bonus) | $2.7 mil. (including $1.7 mil. bonus) |
| Sanders | $2.4 mil. (including $1.5 mil. bonus) | $2.0 mil. (including $1.1 mil. bonus) | $2.6 mil. (including $1.7 mil. bonus) |
| Mullikin | $218,000 (including $20,000 bonus) | $213,000 (including $15,000 bonus) | $113,000 |